**U.S. Department of Justice**

FILED
U.S. DIST. ....

*United States Attorney*
*District of Maryland*
*Northern Division*

---

| | | |
|---|---|---|
| *Rod J. Rosenstein*<br>*United States Attorney*<br><br>*Jefferson M. Gray*<br>*Assistant United States Attorney* | *36 South Charles Street*<br>*Fourth Floor*<br>*Baltimore, Maryland 21201* | *DIRECT: 410-209-4915*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-3091*<br>*TTY/TDD: 410-962-4462*<br>*Jefferson.M.Gray@usdoj.gov* |

September 12, 2012

Caroline D. Ciraolo, Esq.
Rosenberg Martin Greenberg LLP
25 S. Charles Street, Suite 2115
Baltimore, MD 21201-3322

>        Re:    *United States v. Bae Soo "Chris" Chon* (D.Md.)

Dear Ms. Ciraolo:

        This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by Friday, September 21, 2012, it will be deemed withdrawn, and we will move ahead with seeking an indictment against your client. The terms of the agreement are as follows.

### Offense of Conviction

        1.     The Defendant agrees to waive indictment and plead guilty to a Criminal Information which will charge him with Income Tax Evasion for the calendar year 2009, in violation of 26 U.S.C. § 7201. The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

### Elements of the Offense

        2.     The elements of the offense of Tax Evasion as charged in the Information are as follows:

- That the defendant owed substantially more tax for the calendar year 2009 than was declared due on his income tax return;

- that the defendant knew he owed substantially more federal income tax for the calendar year in question than was declared due on his income tax return;



- that the defendant diverted and caused to be diverted revenues of Mirage Cosmetics, Inc. ("Mirage") into foreign bank accounts and failed to report as income the funds diverted into those accounts, with the intention of defrauding the government of taxes owed.

3 L. Sand, J. Siffert, et al., MODERN FEDERAL JURY INSTRUCTIONS: CRIMINAL, Instruction 59-3 (Income Tax Evasion: Elements of the Offense).

## Penalties

3.     The maximum sentence provided by statute for the offense of Tax Evasion to which the Defendant is pleading guilty is as follows: five (5) years' imprisonment, a fine of $100,000.00, and a three-year term of supervised release.

In addition, the Defendant must pay $100.00 as a special assessment for the count to which he is pleading guilty pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. The Defendant further understands that he will be subject to an order of restitution to the Internal Revenue Service (IRS) pursuant to 18 U.S.C. § 3663(a)(3). If a fine is imposed, it shall be payable immediately,[1] unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked – even on the last day of the term – and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.     The Defendant understands that by entering into this agreement, he surrenders certain rights, as outlined below.

a.     The Defendant has the right to have his case presented to a Grand Jury, which would decide whether there is probable cause to return an Indictment against him. By agreeing to proceed by way of Information, he is giving up that right and understands that the charges will be filed by the United States Attorney and not the Grand Jury.

---

[1]     Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

b. If the Defendant had pled not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

c. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

d. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

e. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

f. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

g. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

h. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

i. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may

have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6.     (a)     This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto, which the Defendant acknowledges this Office could prove beyond a reasonable doubt if this matter had proceeded to trial, and to the following applicable sentencing guidelines factors:

The parties agree that U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1 are the appropriate Guideline provisions in this case with regard to the Defendant's conviction for Tax Evasion. Because the amount of the tax loss in this case is between $400,000.00 and $1,000,000.00, the base offense level in this case is a level **twenty (20)**, pursuant to U.S.S.G. § 2T4.1(H).

The parties disagree as to whether the defendant attempted to cause an additional tax loss to the IRS of approximately $228,292.60 in 2010 that was frustrated by the detection of the scheme. However, even if this additional sum is included in the loss figure, it would not take the loss amount above the $400,000 - $1 million range.

As noted below in ¶ 9, the parties further disagree about the applicability of the "sophisticated means" enhancement under U.S.S.G. § 2T1.1(b)(2), and the appropriateness of a departure under U.S.S.G. § 5K2.0 for extraordinary acceptance of responsibility.

(b)     This Office does not oppose a **two (2)** level reduction in the Defendant's adjusted offense level, based upon the Defendant's prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct under U.S.S.G. § 3E1.1(a). This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an

additional **one (1)** level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant fails to admit each and every item in the factual stipulation; denies involvement in the offense; gives conflicting statements about his involvement in the offense; is untruthful with the Court, this Office, or the United States Probation Office; obstructs or attempts to obstruct justice prior to sentencing; engages in any criminal conduct between the date of this agreement and the date of sentencing; or attempts to withdraw his plea of guilty.

7.      The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.      This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, with the exception of the matters set forth in ¶ 9 below, no other offense characteristics, sentencing guidelines factors, or departures set forth in the United States Sentencing Guidelines will be raised or are in dispute. The Defendant agrees that if he wishes to argue for any variances pursuant to 18 U.S.C. § 3553(a) that could take the sentence outside of the advisory guidelines range, his counsel will notify the Court, the United States Probation Officer and government counsel not less than thirty (30) days in advance of sentencing of the facts or issues he intends to raise in order to afford the government and the Probation Officer a reasonable opportunity to investigate and research the issue or issues in question.

## Disputed Factual and Guidelines Issues

9.      As noted above, the parties disagree with regard to the applicability of the **two (2)** level "sophisticated means" enhancement pursuant to § 2T1.1(b)(2) & comment. (n.4). The government maintains that this enhancement is applicable here because the offense involved "hiding assets or transactions . . . through the use of fictitious entities, corporate shells, or offshore financial accounts," examples of conduct that according to the Guidelines commentary, "ordinarily indicate[] sophisticated means." The defense  maintains that this enhancement is not appropriate under the facts of this case because the Defendant did not engage in "especially complex or especially intricate conduct."

The parties also disagree with regard to the applicability of a departure for extraordinary acceptance of responsibility under U.S.S.G. § 5K2.0, which the defense will contend at sentencing is merited here.

These differences will be resolved by the Court at the Defendant's sentencing hearing after considering the parties' submissions and any testimony or documentary evidence they may present.

## Restitution and the Defendant's Civil Tax Obligations

10. The Defendant agrees to pay restitution to the IRS in the total amount of $412,404.00, plus penalties as set forth in ¶ 11 and interest as provided by statute, pursuant to 18 U.S.C. § 3663(a)(3). The Defendant agrees that the total amount of restitution reflected in this agreement results from the Defendant's fraudulent conduct. In accordance with this agreement, the defendant tendered two checks to the IRS on September 11, 2012 in the amounts of $111,069.72 and $679,775.78, reflecting the agreed restitution and his counsel's calculation of the amount of the applicable interest and penalties, for the tax years 2008 and 2009 respectively. The total amount of restitution consists of the following:

| Tax Years | Amount of Additional Tax Due |
| --- | --- |
| 2008 | $55,957.00 |
| 2009 | $356,447.00 |
| **Total:** | $412,404.00 |

11. The Defendant agrees that he is liable for the fraud penalty under 26 U.S.C. § 6663 on the amount of additional tax due set forth in ¶10. Defendant agrees to the immediate assessment of the fraud penalty on the amount of additional tax due set forth in ¶ 10. The Defendant agrees not to challenge or dispute any fraud penalties on the additional tax due set forth in ¶ 10. As stated in ¶ 10, the Defendant remitted advance payment of the fraud penalties (based upon a calculation of 75% of the amount of the additional tax due) to the IRS on September 11, 2012.

12. The Defendant further agrees that in order to resolve his civil liability for failing to file reports of Foreign Bank and Financial Accounts, Form TD F 90-22.1, he will pay as an additional penalty fifty percent (50%) of the highest aggregate balance in the HSBC and the Bank Woori accounts for the calendar year 2009, and that he will do so prior to his sentencing in this case.

13. If the Court orders the defendant to pay restitution to the IRS for the failure to pay tax as part of the sentencing process in this case, the IRS will use the restitution order as the basis for a civil assessment. *See* 26 U.S.C. § 6201(a)(4). The defendant does not have the right to challenge the amount of this assessment. *See* 26 U.S.C. § 6201(a)(4)(C). However, the parties agree that the defendant's payments on September 11, 2012 shall be credited against the amount he is ordered to pay as restitution, interest, and § 6663 penalties in this case. If there is any remaining balance that remains unsatisfied when those numbers are calculated for purposes of the restitution order, it is agreed that the IRS is not precluded from administrative collection of any outstanding portion of the restitution-based assessment, including levy and distraint under 26 U.S.C. § 6331.

14.    The Defendant agrees that he will sign any IRS forms deemed necessary by the IRS to enable the IRS to make an immediate assessment of that portion of the tax and interest that he agrees to pay as restitution.

15.    The parties understand that the Defendant will receive proper credit, consistent with ¶ 10 above, for the payment made pursuant to this agreement. Except as set forth in the previous sentence, nothing in this agreement shall limit the IRS in its lawful examination, determination, assessment, or collection of any taxes, penalties or interest due from the defendant for the time period covered by this agreement or any other time period.

16.    Defendant agrees that this agreement, or any judgment, order, release, or satisfaction issued in connection with this agreement, will not satisfy, settle, or compromise the Defendant's obligation to pay the balance of any remaining civil liabilities, including tax, additional tax, additions to tax, interest, and penalties, owed to the IRS for the same period or any other time period.

## Obligations of the United States Attorney's Office

17.    At the time of sentencing, this Office will recommend that the Defendant be sentenced at a point within the lower half of the guideline range that is determined to be applicable to him by the sentencing judge. In accordance with U.S.S.G. § 5E1.2(a), which provides that "The Court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine," the United States will ask the Court to impose a fine at a point within the guideline range established by the Court, which it will determine based upon all the information available to it at that time.

18.    The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

19.    If the defendant enters a guilty plea and is sentenced on the charge set forth in ¶ 1, and otherwise fully complies with all the terms of this agreement, this Office will not initiate or bring any further charges against the Defendant with respect to any conduct previously made known to this Office and the IRS that relates to his personal income tax returns, corporate tax returns, or his personal or Mirage's corporate financial affairs, reporting or payment obligations for the tax years 2008 through 2010.

## Waiver of Appeal

20.    In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.    The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal his conviction;

7

b.      The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (i) the Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds **thirty-seven (37)** months imprisonment; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it is below **twenty-four (24)** months imprisonment.

c.      Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d.      The Defendant waives any and all rights under the Freedom of Information Act and the Privacy Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency. The Defendant further agrees that he will not seek disclosure of the sealed affidavit supporting the search warrants that were originally obtained by the government in this matter in November 2010.

## Obstruction or Other Violations of Law

21.      The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, other than a minor traffic offense, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

22.      The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole

discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

23.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties. If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By:

Jefferson M. Gray
Assistant United States Attorney

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_Sept. 18, 2012_
Date

Bae Soo "Chris" Chon

9

I am Mr. Chon's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

_9 - 18 - 2012_
Date

_Caroline D. Ciraolo_

10

## ATTACHMENT A

At all times material herein, defendant **BAE SOO "CHRIS" CHON** was the owner and President of Mirage Cosmetics, Inc. (Mirage).  Mirage was a subchapter S corporation, founded in 1991, that was in the business of manufacturing and selling its own cosmetics product lines.  Mirage manufactured a number of cosmetics products (including fingernail polish, lip gloss, lipstick, and facial blush powder) at its facility located on Tucker Street in Beltsville, Maryland.  Mirage marketed its products domestically primarily through a contract with the Walgreens drug store chain, and it also sold its cosmetics products to Target, Costco, and other chain stores.  Mirage also marketed its products in Canada, Australia, and many countries in Europe and east Asia.  Mirage reported gross receipts in 2008 of $18,278,329.00 and in 2009 of $16,403,862 – although these figures are understated, for the reasons set forth below.  On March 17, 2011, many of the assets of Mirage were acquired by a leading international cosmetics company in return for the payment of $39 million.

Mirage was wholly owned by defendant **CHON**.  Because Mirage was a subchapter S corporation, the net profits earned on Mirage's business operations passed through directly to **CHON**, and were required to be reported as taxable income on the joint income tax return that he filed each year with his wife.  Shawn Chunsik Kim was Mirage's International Marketing and Sales Vice-President.  Kim worked for Mirage from July 1997 until the company's assets were sold in March 2011.

All United States citizens who have income in excess of a certain amount are required to file a federal income tax return.  On this return, United States citizens are required to report their total income, whether derived from sources within the United States itself or from foreign countries.  United States citizens who have an interest in, or

signature or other authority over, a financial account in a foreign country with assets in

excess of $10,000 are further required to disclose the existence of this account on

Schedule B, Part III of their income tax returns.  In addition, any United States resident

having a financial interest in, or signatory or other authority over, financial accounts

maintained with financial institutions in foreign countries are required to file a Report

of Foreign Bank and Financial Assets (known as an FBAR, Form TD F 90-22.1) on or

before June 30 of each calendar year if the aggregate balances of such foreign accounts

exceeded $10,000 at any time during the previous calendar year.

Starting in the fall of 2008, **CHON** commenced a tax evasion scheme whereby he

caused the proceeds from Mirage's transactions with many of its foreign distributors to

be diverted into foreign bank accounts at HSBC Bank in Hong Kong and Bank Woori in

Seoul, South Korea.  The funds deposited into these accounts were not reflected on

Mirage's official books and records, which therefore reflected substantially less than the

full revenues derived from the company's sales to its affiliates and distributors overseas.

This in turn served to reduce the Mirage income that was shown as being passed

through to **CHON**.  As a result, the income from Mirage that was reported on **CHON**'s

2008 and 2009 personal income tax returns was understated, resulting in a material

understatement of **CHON**'s income tax liability for each year.  This diversion of funds

from Mirage's foreign customers continued until the fall of 2010, with the last transfer

of funds into the HSBC account taking place on November 2, 2012.  On November 16,

2010, law enforcement agents from the Criminal Investigation Division of the Internal

Revenue Service (IRS-CID) who had learned about **CHON**'s diversion of funds into the

2

Bank Woori and HSBC Bank accounts executed a search warrant at Mirage's offices and manufacturing facility in Beltsville, Maryland.

CHON was introduced to the idea of depositing corporate receipts into a foreign account and thereby evading income taxes on those funds by the owner and chief executive officer of one of the company's domestic American suppliers, Individual A. In November 2007, Kim, CHON, and Individual A were all attending the annual CosmoProf-Asia cosmetics trade show in Hong Kong. Individual A told CHON that by establishing an overseas bank account to receive the proceeds from Mirage's overseas transactions, CHON could save money on his taxes and also get some personal use from the money. CHON maintains that he did not initially act upon Individual A's suggestion, but that when Individual A again raised the issue at the next annual trade show in November 2008, he decided to follow Individual A's advice. Individual A directed CHON to a representative of a company in Hong Kong that created offshore shell entities and then offered those entities for sale, including to persons such as CHON who wanted to open foreign bank accounts. The Hong Kong company handled all aspects of the transaction – selection of the entity name, formation in the foreign jurisdiction (in this case, the Sultanate of Brunei), escorted CHON to the offices of HSBC to open the account and took the lead role in meeting with bank officials, as well as all related paperwork. All CHON was required to do was sign the necessary documents where indicated and pay the required fees.

CHON told Kim that he was going to establish an account in the name of another company at a bank in Hong Kong. Subsequently, CHON confirmed to Kim that he had established an account at HSBC Bank in Hong Kong (account # xxx-xxxxx9-838) under

3

the name of Giant Century Holdings Limited (GCHL). As noted, this was a shell entity previously created by the Hong Kong company that maintained an inventory of such entities. **CHON** became GCHL's sole director and stockholder in November 2008.

**CHON** supplied Kim with the wire transfer information for the HSBC account, and Kim instructed many of Mirage's foreign distributors to start sending their payments to the HSBC account. (Mirage's remaining foreign distributors continued to wire their payments to the company's domestic account at Bank of America.) Among the foreign distributors who were directed to send their payments to the HSBC account in Hong Kong were those in the United Kingdom, Australia, Estonia, Dubai, Kuwait, Lebanon, South Africa, Germany, and Japan. Mirage's foreign distributors began transferring funds by wire into the GCHL account in March 2009, and continued to do so through November 2, 2010. These payments were not tracked in Mirage's main computer system and accordingly were not reflected on Mirage's books and records. Instead, Kim tracked these payments on spreadsheets that he maintained in his laptop computer.

In all, $857,214 in payments from Mirage's foreign distributors were diverted into the HSBC account in 2009 and an additional $538,664.58 was transferred into the account in 2010 prior to the date that the search warrant was executed at Mirage's offices. None of the funds transferred into the HSBC account were reported on Mirage's 2009 tax return, or were reflected as pass-through income on **CHON**'s own returns for 2009. When the search warrant was executed in November 2010, approximately $986,000 out of the total transferred funds of $1,395,878 remained in the HSBC account.

4

During the period between September 2008 and November 2010, **CHON** also caused a number of payments from Mirage's foreign distributor in South Korea, as well as certain payments from its distributors in the United Kingdom, Australia, New Zealand, China, and Vietnam, to be directed to an account (#xxxxxxxxx3016) at Bank Woori in Seoul established in the name of Mirage's local distributor.  In all, $463,835 was transferred into this account from these distributors between September 2008 and November 2010.  Of this sum, $40,818.29 was expended for business-related purposes during 2008 and 2009.  **CHON** withdrew another $167,507.54 for his personal use in 2008 and 2009, and an additional $36,363.64 for his own use in 2010, for a total of $203,871.18.  The balance of the funds transferred into the Bank Woori account ($219,145.53) has remained in the account.  Kim likewise kept track of the funds coming in and out of this account on his laptop computer, relying upon information received from the account holder in South Korea and **CHON** to stay current with the deposits.

CHON maintains that he formed the intention in or about August 2010 to stop diverting payments to the offshore accounts and to accurately report all of the additional income that had passed through or been collected in those accounts.  The government agrees that **CHON** told his company's chief financial officer in early November 2010 that he intended to close the HSBC account and transfer the funds elsewhere, but is aware of no evidence supporting **CHON**'s claim that he intended to disclose these funds to the IRS and to report the additional taxes due and owing on these amounts other than his own assertion that he intended to do so.

In early November 2010, **CHON** traveled to Hong Kong for the annual CosmoProf trade show and attempted to close the HSBC account.  By this time, IRS

5

criminal investigators had already learned about the existence of the account at HSBC, and as a result of inquiries submitted by the IRS to the Hong Kong authorities, the Hong Kong authorities had asked HSBC to freeze the account.  Accordingly, HSBC representatives refused to meet with **CHON** and advised him that the account was frozen.

CHON learned of the government's investigation and its then-ongoing execution of a search warrant at Mirage's offices in Beltsville immediately upon his return to the United States on November 16, 2010.  That same day, during the execution of the search warrant, **CHON,** by his counsel, advised the government of his desire to immediately accept responsibility and to assist in the investigation of his conduct.  In late November 2010, his counsel met with the government to discuss making arrangements to repatriate the funds from the HSBC account.  **CHON** subsequently timely filed his 2010 federal and state personal and corporate tax returns in the spring and fall of 2011, and in these filings he reported the amounts that had been deposited in the Bank Woori and HSBC accounts during the 2010 tax year prior to the date when the search warrants were executed, and he paid the tax due.  On September 11, 2012, **CHON** made advance payments to the IRS of the amounts of additional tax reflected herein, plus agreed penalties and interest required by statute, for the tax years 2008 and 2009.

None of the $203,871.18 that was expended by **CHON** for personal purposes or that was left in the Bank Woori account from the transfers made during 2008 and 2009 was reported on Mirage's tax returns, or reflected as pass-through income on **CHON**'s own returns for 2008 and 2009.  An additional $113,600 was transferred into the account during calendar year 2010 prior to the date of the search.  (No funds from the

6

Bank Woori account were used for business purposes during 2010.) Thus, a total of

$423,017 was transferred into the Bank Woori account and either spent for personal

purposes or retained in the account without reporting these funds on Mirage's or

**CHON**'s 2008 or 2009 returns, or was transferred into this account prior to the date of

the execution of the search warrants in 2010. In addition to not reporting the revenues

diverted into the HSBC and Bank Woori accounts on Mirage's tax returns and his

personal tax returns for 2008 and 2009, **CHON** also did not file the required FBAR

forms on these accounts prior to June 30, 2009 and June 30, 2010, and did not disclose

the existence of these accounts on his tax returns for the years 2008 and 2009.

On March 23, 2009, which was several months after **CHON** originally opened

the HSBC account in the name of GCHL, but at almost the very time that **CHON** and

Kim first instructed many of Mirage's foreign customers to begin diverting their

payments into the HSBC account, Douglas Shulman, the Commissioner of the Internal

Revenue Service (IRS), announced the agency's Overseas Voluntary Disclosure Program

(OVDP), which offered taxpayers who maintained previously undisclosed foreign bank

accounts incentives to disclose those accounts and bring themselves into compliance

with the law. This highly-publicized program remained open until October 15, 2009,

and nearly 15,000 taxpayers took advantage of it to make voluntary disclosures about

foreign bank accounts in more than 60 foreign countries. The closing of the OVDP in

October 2009 was followed by a well-reported series of criminal prosecutions of

individuals for maintaining undisclosed foreign bank accounts.

**CHON** was in the 35% tax bracket in the tax years 2008 and 2009. Thus, as

shown in the following table, the approximately $1,818,895 in revenues from Mirage's

7

foreign clients that was diverted into the HSBC and Bank Woori accounts resulted in understating **CHON**'s tax liability on his 2008 federal tax return by approximately $55,957.00; in understating **CHON**'s tax liability on his 2009 federal tax return by $356,447.00; and, if unreported, would have understated **CHON**'s federal tax liability for the 2010 tax year by approximately $228,292.60, for a total of $640,696.60 in understated federal income tax liabilities.

### FEDERAL INCOME TAX LOSS

| TAX YEAR | UNREPORTED REVENUES NOT EXPENDED FOR BUSINESS PURPOSES (BANK WOORI - SOUTH KOREA) | UNREPORTED REVENUES NOT EXPENDED FOR BUSINESS PURPOSES (HSBC - HONG KONG) | COMBINED TOTALS BY YEAR | FEDERAL TAX LOSS (calculated by IRS) |
|---|---|---|---|---|
| 2008 | $158,292.63 | N/A | $158,292.63 | $55,957.00 |
| 2009 | $151,122.17 | $857,214.00 | $1,008,336.17 | $356,447.00 |
| TOTALS (excluding tax year 2010 transfers) | $309,414.80 | $857,214.00 | $1,166,628.80 | $412,404.00 |
| 2010 | $113,600 | $538,664.58 | $652,264.58 | $228,292.60 |
| TOTALS (including tax year 2010 transfers) | $423,014.80 | $1,395,878.58 | $1,818,893.38 | $640,696.60 |

**CHON**'s Maryland tax loss for the tax year 2008 is approximately $14,958.59, and for tax year 2009, the figure is approximately $95,287.11 (making a combined total of $110,245.70 for

8

those two years).  An additional $61,638.73 state tax loss would have resulted for the tax year 2010 if the diverted income was not reported, for a total of $171,884.43 in additional Maryland state income tax liabilities.  **CHON**'s combined additional federal and state taxes due and owing were therefore $522,649.70 for the tax years 2008 and 2009, and the combined total loss is $812,581.03 if the 2010 tax year is included as well.